128 So.2d 44 (1961)
Mrs. Minda ROBARDS
v.
AMERICAN AUTOMOBILE INSURANCE CO.
No. 5185.
Court of Appeal of Louisiana, First Circuit.
March 6, 1961.
*45 Seale, Hayes, Smith, Keogh & Franklin, Baton Rouge, for appellant.
H. Alva Brumfield, Robert E. Turner, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
JONES, Judge.
Plaintiff brings this suit for damages as a result of a collision between a Pontiac car driven by her husband, since deceased, with an Oldsmobile car driven by Dolly H. Donovan and owned by her husband, John F. Donovan. The liability insurer was the American Automobile Insurance Company. The plaintiff contends that her husband died as a result of the accident and the sole and proximate cause thereof was the negligence of Mrs. Donovan. The District Judge rendered judgment in favor of the plaintiff in the sum of $13,605 and from this judgment the defendant liability insurer has appealed, the other *46 defendants having been dismissed from the suit during the trial on motion of counsel for the plaintiff. The plaintiff has answered the appeal seeking an increase in the award.
The accident which forms the basis of this suit occurred on the Airline Highway in the Parish of East Baton Rouge about one-quarter mile south of the traffic circle, which is the junction of Florida Boulevard and the Airline Highway. The Airline Highway is a four-lane, paved highway with a neutral ground 16 feet in width. The highway runs in a north-south direction and, on one side of the neutral ground is a two-lane highway running south and on the other side of the neutral ground is a two-lane highway running north. Each traffic lane is 10 feet in width. Immediately prior to this accident, the two cars involved in this collision were traveling on said Airline Highway in a northerly direction.
Mrs. Donovan, who was driving an Oldsmobile car, had passed the Robards car, driven by Mr. Robards, about one mile south of the Broadmoor Subdivision and the evidence shows that there was an entrance to this subdivision of 140 feet from the eastern edge of the Airline Highway. It was Mrs. Donovan's intention to turn into Broadmoor Subdivision for the purpose of visiting her son but she missed this entrance and drove some 15 or 20 feet past said entrance, at which time she stopped her car and backed it up with the back thereof facing west and the front facing east. The evidence shows that the front wheels of the car were on the shoulder of the road on the east and this shoulder is shown to be 60 feet in width. The back of the car extended across the center line and usurped at least one-half of the 10 feet of the western half of the north traffic lane. When Mrs. Donovan had gotten her car in this position, she looked to the south and saw the lights from the Pontiac car proceeding north and toward her and she estimated that the distance of this car down said road was two or three blocks. Of course, her car at this time was some 15 feet north of the street leading into Broadmoor Subdivision and facing in an east-southeast direction and she explained the reason she did not attempt to move the car was that she thought she saw some water in a ditch and she further explained, "I panicked there and did not move the car further after I had positioned myself to make that turn." The only evidence in this record to show the speed of Robards' car was the testimony of Mrs. Donovan to the effect that she had passed it about a mile down the road at which time it was running 35 miles per hour and the calculations given by the expert Mr. Doyle, an automotive engineer, as to the distance a car could be stopped after the application of brakes. He estimated that the car could have been stopped within 70 feet after the brakes were applied and since it is shown the brakes of Mr. Robards' car were applied some 50 feet south of the Oldsmobile and the ensuing collision was not a severe one, then it was reasonable to suppose that the car was traveling approximately 35 miles per hour immediately prior to the accident. He later fixed the speed of the car at 37½ miles per hour immediately preceding the accident. Of course, Mr. Robards died subsequent to the accident and he was the only occupant of his car. The Robards car was traveling in the outside or east lane and from the imprint of the skids, it is shown that he was veering from the eastern to the western lane in order to get around the Oldsmobile. However, since it was impossible for him to do so, as this latter car was usurping more than half of the west or inside lane of said highway, the right front of his Pontiac struck the left rear of the Oldsmobile from the rear door back and the debris from the cars was some two feet west of the center line of the highway.
Under the factual situation as set forth above, the District Judge found that Mrs. Donovan's negligence was beyond question *47 and with this we agree. He further found that there was no contributory negligence on the part of Robards and permitted recovery by the plaintiff. He stated that to apply the strict rule contained in the case of Monteleone v. Dularge Packing Co., La.App., 73 So.2d 335 and Noland v. Liberty Mutual Insurance Co., 232 La. 569, 94 So.2d 671, to the effect that a driver must see objects within the vision of his headlights a distance of 200 feet, he would undoubtedly have to convict Robards of negligence. However, he further pointed out that there are certain exceptions to this rule where exceptional circumstances are found to exist. He cited in support thereof the case of Fisher v. Norwich Union Fire Insurance Society, Ltd., La.App., 119 So.2d 562. The Judge prepared a rough sketch which he has attached to his reasons for judgment, showing the various positions of the Robards car immediately preceding the accident and the position of the Robards car as well as the Donovan car at the time of said accident. As position number 1 on the sketch he fixed the location of the Robards car as 175 feet from the point of collision and he stated that, undoubtedly, Robards saw the headlights of the Donovan car at that time and had seen them while still a greater distance away but that he could not see the car itself from that position. We agree that he saw the lights from that distance or at least the right front light because the Oldsmobile car was faced in an east-southeast position. Position number 2 on the sketch shows that the Robards car was 105 feet from the point of collision. Assuming that the car was traveling 37½ miles per hour, as found by the Trial Judge, and the reaction time being one second, then he traveled a distance of 55 feet and the tire marks commenced and continued 50 feet from the point of collision. It was, accordingly, the distance of 105 feet from the point of collision that the District Judge found that Robards actually saw the Donovan car blocking at least the east traffic lane. It is apparent Robards did not believe the car was blocking the west traffic lane because he veered to the left in an effort to go around it but he was unable to do so due to the west traffic lane being blocked by the rear of the Oldsmobile car.
A motorist traveling on a highway after dark must guard against striking objects in the road with which he may be suddenly confronted and this constitutes an exception to the general rule that the road is safe for travel even at night. However, a motorist traveling by night is not charged with the duty of guarding against striking an unexpected or unusual obstruction which he had no reason to anticipate he would encounter on the highway. Vowell v. Manufacturers Casualty Insurance Co., 86 So.2d 909, 229 La. 798; Kirk v. United Gas Public Service Co., 185 La. 580, 170 So. 1; Gaiennie v. Cooperative Produce Co., Inc., 196 La. 417, 196 So. 377; Dodge v. Bituminous Casualty Corp., 214 La. 1031, 39 So.2d 720. It is true that in the above-cited cases there were no lights on the vehicles that were parked on the highway and, in some instances, there was approaching traffic that partially blinded the driver of the car which ran into the stationary vehicle. However, in the present case, even though there were lights on the Oldsmobile car, it was positioned in such a manner in the highway that it was reasonable for Robards to assume that it was not blocking the west or passing lane of said highway. Further, the record reflects that immediately west of the entrance to Broadmoor Drive there was a break in the neutral ground to permit cars traveling south to cross over and enter Broadmoor. Thus, when Robards first saw the right front light of the car facing toward Boardmoor Drive, it was reasonable for him to assume that the car was moving and entering Broadmoor. To say the least, he had only a matter of seconds to *48 determine the existing condition and certainly he had no reason to expect the Oldsmobile to be blocking both lanes of a two-lane highway.
We appreciate the fact that the Fisher case, supra, is not on all fours with the factual situation herein presented due to the fact that the headlights of the car in the Fisher case blended somewhat with the lights of the service station immediately north of it but, after all, the court did state in the Fisher case [119 So.2d 564], "We are unable to say that the naked fact that the plaintiff driver saw a headlight shining, not towards him, but across the road, should have alerted him to the presence of an automobile stopped dead in his path in time for him to have stopped and avoided the accident."
We are, accordingly, of the opinion that Mrs. Donovan was guilty of negligence which was the proximate cause of the accident and the driver Robards was not guilty of contributory negligence.
Should we have fallen into error in reaching the conclusion that Robards was not guilty of contributory negligence, which we do not believe that we have, then we are of the opinion that Mrs. Donovan had the last clear chance to avoid this accident. Her testimony was that after she turned the car around in the road, with it facing in the position heretofore outlined, she looked down the highway and saw the lights from the Robards car a distance of some two or three blocks which, of course, would be from 600 to 900 feet. She stated that she made no attempt to move her car out of the highway and onto the shoulder of the road because she saw some water in a ditch and thought she would either kill or injure the occupants of her car. The shoulder of the road at this point, as shown by the testimony of Mr. Doyle, is 60 feet wide on the eastern side immediately in front of where her car was parked. An examination of the photograph in the record showing this shoulder does not depict that there was a ditch on the east side of said shoulder and it further shows that this 60-foot shoulder was covered with grass and shells. Her car was only 18 feet long and she could have easily moved it onto the shoulder and avoided this accident. In order to apply the doctrine of last clear chance, three essential elements must be established: first, that the other person was in a position of peril of which he was unaware or from which he was unable to extricate himself; second, that the person against whom such doctrine is charged actually discovered or was in a position where he should have or could have discovered such other person's peril; and, third, that at the time the person charged with responsibility could have, with exercise of reasonable care, avoided the accident. Lavigne v. Southern Farm Bureau Casualty Insurance Co., La.App., 125 So. 2d 430; Moore v. Shreveport Transit Co., La.App., 115 So.2d 218.
There were three other people occupying the Oldsmobile with Mrs. Donovan. One of them was Mr. Dyhrkoff, a young man who was sitting on the back seat, and after Mrs. Donovan had stopped the car and had seen the lights of the approaching Robards car, she asked Dyhrkoff how far her car was in the back and he answered her (page 229 tr.), "I don't know how far it is now but he is picking up speed and I believe he is going to hit us. Why don't you move?" Her answer was that she couldn't move because she would go into the ditch and she further stated, "I didn't say `he will stop' but if I had to take a chance that I would take the chance that he would stop and we would perhaps be spared if I didn't go into the ditch. (Italics ours.)
We are of the opinion that when this conversation took place, Robards was not necessarily in a perilous position of which he was unaware or of which he could not have extricated himself for at that time he was undoubtedly a distance of some 200 feet but he continued to proceed *49 up the road and when he got to a point 105 feet south of the Oldsmobile he was then in a position where he could not have extricated himself and Mr. Donovan is bound to have known this. Mr. Doyle was asked the question, "How long would it take Mrs. Donovan to have moved her car 18 feet?" and he said that, exclusive of reaction time, it would require 1½ seconds, so even when Robards was 105 feet from the Oldsmobile, Mrs. Donovan had adequate time to move it on to the shoulder of the road, or a distance of 18 feet, before the Robards car could have traveled 105 feet, with the application of brakes the last 50 feet. The motor of the Oldsmobile was running and the only action required of Mrs. Donovan would have been to press down on the accelerator. However, all she did, according to her testimony, was turn her head and look the other way.
Accordingly, we are of the opinion that Mrs. Donovan had the last clear chance to avoid the accident, and plaintiff is entitled to recover herein.
The evidence shows that as a result of the accident Robards received chest injuries, he having complained immediately after the accident to Lieutenant Broussard of such injuries, and Dr. Schaffarzick, who gave him emergency treatment, testified he had severe contusion of the chest. A co-worker, John Elder, with whom Robards worked at Gramercy, testified that for four or five days after the accident Robards would grab his chest when he started to laugh or cough. This witness didn't see Robards after the five-day period because the latter returned to his home in Illinois at that time. The witness Clesi testified that some three or four days after the accident, he, as a representative of the insurance company, questioned Robards and at that time the latter complained of pains in his chest and had difficulty in talking. Another witness, Lathrop, who saw Robards in Illinois, testified that the latter complained about his chest hurting him quite a bit. Defendant offered the testimony of Mrs. Helen Jobe, who runs a tourist court in Arthur, Illinois. The evidence shows that when Robards returned to Illinois he stayed at this tourist court until the time of his death. The evidence is quite clear that Robards had lived with Mrs. Jobe for some few years prior to his death and she testified by deposition that he made no complaints relative to his physical condition prior to his death.
Since Robards did not die until some two weeks after the accident, it is contended by defendants that the injuries he received in said accident did not contribute to his death. Two doctors have testified in the case by deposition, Dr. H. L. Messmore, who attended Robards at the time of his death, and Dr. A. G. Ginsberg, a pathologist who performed the autopsy on the body of Robards, and the report of said autopsy is annexed to the deposition of Dr. Ginsberg. In addition to these doctors who testified by deposition, Dr. Stotler, expert in the field of cardiology, Dr. Colvin, qualified pathologist, and Dr. Luikart, an expert in the field of cardiovascular diseases, also testified. Dr. Stotler was of the opinion that Robards' death was brought about by congestive heart failure due to coronary artery insufficiency and he was further of the opinion that the injuries sustained by Robards in the accident contributed to his death. The testimony of Dr. Stotler further showed that Robards had a very badly diseased heart and that slightest trauma exertion would be sufficient to bring on terminal heart failure. While Dr. Colvin and Dr. Luikart were of a somewhat different opinion than Dr. Stotler, they did admit that if Robards suffered from his chest subsequent to the accident, this could influence their opinion.
We are of the opinion that the injuries which Robards received in the accident contributed to his death.
*50 An award of $500 was made in plaintiff's behalf for the pain and suffering her husband underwent from the date of the accident until the date of his death. The lower court found that these pains were not particularly severe and made a nominal award of $500, which we consider correct.
An award of $2,000 was made for plaintiff's mental pain and anguish and loss of her husband's love, affection and companionship and the court considered this a minimum award, citing in support thereof the case of Brown v. S. A. Bourg and Sons, 239 La. 473, 118 So.2d 891. The plaintiff and Robards were married twice and were separated for a period of 1½ years and then remarried in the year 1955. They had not lived together in Illinois for some period of time prior to Robards coming to Louisiana to work where he remained for several months. She did not accompany him here and, as a matter of fact, when he went back to Illinois, he did not return to her but went to the tourist court of Helen Jobe where he remained until he died. There is no question but what the parties were living separate and apart long before the death of Robards. Mrs. Robards even admitted that she knew her husband was living with Helen Jobe. In the Brown case, supra, it was not proven that the parties were separated but it was only intimated and this was denied by the plaintiff wife. Under the circumstances, we feel that an award of $1,500 would be adequate to this plaintiff for mental pain and anguish and for the loss of love, affection and companionship.
The District Court awarded $10,000 to the plaintiff for the loss of her husband's support. The husband at the time of his death was 61 years of age and it was stipulated that the statutory tables give a life expectancy of 13 years to a 61 year old man. However, defendant did not stipulate that Robards, with a badly diseased heart, had any such life expectancy. We note that the plaintiff's testimony is very conflicting as to how much her husband had been contributing to her support. Interrogatories were addressed to her prior to the trial and her answer thereto indicated that she received $200 a month from her husband. However when her discovery deposition was taken in Illinois, she was asked if he gave her any money at all and she stated:
"A. Just once in a while if he didn't spend it on Helen Jobe or she didn't steal it from him."
However, at the trial this plaintiff testified that her husband contributed $500 to $600 a month to her support. The gross income for 1955 of both the parties was $3,646.25 and for 1956 $5,813.12 and, as pointed out by the District Judge, a considerable portion of this income was from oil royalties and farm produce. Mrs. Robards owned in her own right an 80-acre farm and it is apparent that most of the income she received was from this farm and the oil royalties. For her husband to have paid her $500 or $600 per month, he would have had to have made more than $1,000 as a pipefitter and this is absurd on the face of it. In the case of Brown v. S. A. Bourg, supra, the Supreme Court of this state pointed out that many factors must be considered in making an award for support, among these being the life expectancy of the survivor, the divorce rate, the percentage of remarriages of widows, particularly to second husbands whose earnings are greater than those of the first, the condition of the health of the decedent, his possible retirement, the possibility of the increase or decrease in his anual earnings and the change in the value of the dollar over a long period of years. In this case, it must be taken into consideration that plaintiff's husband was 61 years of age, had a badly diseased heart and would either have shortly discontinued working or would have suffered an early demise far shorter than the average human being. We have serious doubts that he was contributing hardly anything to *51 his wife's support and, as a matter of fact, her income was almost equal to his because she received revenues from oil royalties and produce from her own farm in Illinois.
We, accordingly, are of the opinion that the award by the District Court to the plaintiff for the loss of her husband's support in the amount of $10,000 was excessive and it will be reduced to $6,000.
The lower court allowed $1,105 for medical and funeral expenses, stating that they were not disputed, but a check of these items shows that the funeral expenses were $1,085 and the hospital expenses were $17, making a total of $1,102. Accordingly, the judgment of the District Court will be amended by awarding judgment to the plaintiff in the sum of $9,102, in all other respects affirmed.
Amended and affirmed.